AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Texas

FILED

OCT 2 4 2016

CLERK, U.S. DISTRICT COURT

By: _____ Deputy

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| Texas Energy Management surety bond paid to Oklahoma Secretary of State with check #55017605 in the amount of $25,000.00. | ) Case No. 4:16-MJ-696 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Northern _____ District of _____ Texas, Fort Worth Division _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. § 1341 and 1343 | Mail and Wire Fraud |
| 18 U.S.C. § 1349 | Attempt and Conspiracy |
| 18 U.S.C.  § 1956 | and Money Laundering |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew J. Write, United States Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

_____
*Judge's signature*

Date: _____ October 24, 2016 _____

City and state:  Fort Worth, Texas

United States Magistrate Judge Jeffrey L. Cureton
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, Matthew J. Write, being duly sworn, depose and state as follows:

1. Affiant is a United States Postal Inspector assigned to the Fort Worth Division of the U.S. Postal Inspection Service. I am sworn and empowered to investigate crimes involving the U.S. Postal Service. I have been a Postal Inspector for nine years.  Prior to become a Postal Inspector, I was a U.S. Customs and Border Protection Officer for four years. I am currently assigned to investigate mail fraud against consumers, businesses, and the government.  I have conducted investigations involving the theft of U.S. Mail, identity theft, mail fraud, conspiracies, money laundering, embezzlements, burglary, murder, robbery and assault cases. This experience includes participation with other Postal Inspectors and other officers and agents experienced in these subjects. Through my training and participation in criminal investigations, I have become familiar with, and have participated in, the following methods of investigation, including but not limited to; electronic surveillance, visual surveillance, questioning of witnesses, questioning of suspects, the use of search warrants, and confidential informants. In the course of such investigations, I have made numerous arrests. I have participated in numerous federal and state arrest and search warrants, many of which involved the use of the U.S. Mail to commit fraud.  These arrest and search warrants have included the recovery of narcotics and firearms.  I have received training in investigating cases involving mail fraud, identity theft, stolen checks, credit cards, and other financial instruments.

## PURPOSE OF THE AFFIDAVIT

2. The information contained in this affidavit is based upon information personally known to me as a Postal Inspector working on this investigation, my experience, and information and observations relayed to me by other persons. This affidavit sets forth probable cause for the

issuance of a search and seizure warrant. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that violations of federal criminal offenses, including 18 U.S.C. § 1341 and 1343 (Mail and Wire Fraud); 18 U.S.C. § 1349 (Attempt and Conspiracy); and 18 U.S.C. § 1956 (Money Laundering) have been committed.

3.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to seize the items identified in ATTACHMENT A.

### FACTS DEMONSTRATING PROBABLE CAUSE

4.  Certified records obtained from the National Archives and Records Administration indicate that on September 22, 1975, James VanBlaricum (JVB), as President of Kimberly Oil and Gas Company, stipulated and consented to the entry of an order of permanent injunction pursuant to a civil action filed by the Plaintiff Securities and Exchange Commission (SEC), Case No. A-75-CA-149, V. Defendants Kimberly Oil and Gas Company, a Texas Corporation, and JAMES E. VAN BLARICUM.  This permanent injunction barred JVB from:

   a.  Directly or indirectly, by use of the mails or any means or instruments of transportation or communication in interstate commerce, in the connection with the offer, purchase or sale of securities, namely, fractional undivided working interests in oil and gas leases, or any other securities.

   b.  Employing any device, scheme, or artifice to defraud, or making untrue statements of material facts or omitting to state material facts necessary to be stated in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   c. Engaging in any transactions, practice, or course of business which operates or would operate as a fraud or deceit upon any purchaser of the aforementioned securities, or engaging in any other practice or course of business of similar purport or object.

5. On August 21, 2008, Jeffrey Warsing (Warsing), investigator for The Texas State Securities Board (TSSB) contacted the Postal Inspector's Office in Fort Worth, Texas. Warsing reported a potential mail fraud (Ponzi scheme) operated by James E. VanBlaricum, dba Signal Oil and Gas Company (SOG), 5208 Airport Freeway, Ste 100, Fort Worth, Texas 76117. The scheme involved the sale of interests to investors in oil and gas related projects. The TSSB began receiving complaints on JVB in 2004. The complaints were received from SOG company investors relating to various programs promoted by JVB and misrepresentations made to them by SOG salesman. The main complaint was lack of investment payments. This investigation disclosed that during the period January 21, 2006, through January 31st, 2009, fifty-three (53) victims of a mail fraud scheme involving SOG's Land, Lease Programs (LLP) were identified with investments totaling $2,633,090.00. Investors made their initial investments by either mailing personal or cashier's checks from their residence to SOG in Texas, having their financial consultant mail their checks to SOG in Texas for them, or wire transfers to SOG's bank accounts.

6. Postal Inspectors began investigating this case following the referral from TSSB. An analysis of LLP prospectuses obtained from investors showed the following, in part:

   a. Each prospectus reflected an "assured" rate of return on an initial investment amount.

   b. Each prospectus reflected a minimum annual rate of return from nine to fifteen percent of the amount invested.

c. Each prospectus stated investors would receive a full refund of their initial investment amount after the three to five-year investment period.

d. Some prospectuses provided Minimum Assured Income Schedules reflecting assured and estimated potential rates of return of five to thirty-five percent.

e. Some prospectuses reflected potential, projected, or examples of the allocation of investor funds in fifty percent hard assets and fifty percent oil and gas exploration.

7. Many of the victims in the LLP Program invested due to the recommendation of T.D., B.H., or S.S., who are financial consultants.

8. Victim A.S. was interviewed, who stated he invested a total of $100,000.00 in the LLPs through T.D. in 2008, and received promissory notes for each investment which were signed by JVB. A.S. also invested an additional $40,000.00 for his mother who is now deceased. T.D. told A.S. the LLP was a safe program and provided him a prospectus. A.S. was told there was an assured rate of return of fifteen percent per year on his investment. A.S. understood the LLP investment to be of physical assets which would be leased out by SOG. In a letter received by A.S. from SOG dated March 19, 2009, JVB stated the investment assets included regional pipeline, tubular goods, leases, seismic data, production equipment and potential production. The letter also stated, "we have been working to find some source of income for your program, but there is very little activity at this time and the assets are just sitting with no income." A.S. received approximately $5,000.00 in payments from the LLP in 2008. In early 2009, his next two "dividend" checks bounced. Due to A.S.'s continued persistence in contacting SOG, JVB sent A.S. lulling letters and additional "dividend" payments, some of which came in the form of Texas Energy Mutual (TEM) checks. A.S. has not received his initial investment back.

9. Victim E.W. invested a total of $62,500.00 in SOG's LLPs through ▆▆▆ S.S.  S.S. had advised E.W. regarding other investments and recommended oil investments to E.W.  S.S. told E.W. each time she invested in LLP her percentages (return on investment) would go up.  S.S. described LLP as a real money maker and offered her thirty-five percent return on investment in oil and gas.  E.W. recalled it being a five-year program after which time she would get her initial investment back.  E.W. said to date she has not gotten her principal investment back. Although E.W. invested with SOG, she received a TEM "interest" check.

10. Victim G.S. invested a total of $70,000.00 in SOG's LLP program through S.S.  G.S. was told the LLP program was a five-year period of investment with a guaranteed interest rate of nine percent.  After this five-year period his investment was to be repaid in full.  S.S. told G.S. this investment was low risk.  Although G.S. invested with SOG, he received a TEM "interest" check.

11. Records of the Texas Secretary of State revealed SOG was created on October 23, 2000, by the filing of Articles of Incorporation.  JVB was listed as the registered agent and sole incorporator.  On March 23, 2001, Articles of Amendment were filed with the Texas Secretary of State for SOG and was signed by the sole director of the corporation, JVB.  SOG was initially operated by JVB from the address 5208 Airport Freeway, Suite 100, Fort Worth, Texas 76117.  Beginning in 2004, SOG was also receiving mail at 2100 W NW Highway #114, Grapevine, TX 76051.  This location was a Commercial Mail Receiving Agency (CMRA). This box was changed to Texas Energy Management (TEM) on November 2, 2010 by JVB.

12. In the Affiant's experience as a Postal Inspector, CMRA's such as UPS Stores, Mail Boxes Etc., FedEx Offices, Virtual Offices, and others are a paid service provided by these businesses to consumers and businesses.  CMRA's are required to file, with the United States Postal

Service, a PS Form 1583, *Application for Delivery of Mail Through Agent*. This form lists, among other information, the name of who is allowed to receive mail and the physical address of the applicant. In addition, a government ID is verified against the application by the CMRA. Customers of CMRA's tend to use them due to proximity to their business/residence and longer hours of operation. CMRA's will hold mail and packages for their customers as long as the box payment is maintained. In the Affiant's previous investigations, criminals used CMRA's to facilitate fraudulent schemes and to make fraudulent businesses appear legitimate. CMRA's allow for multiple individuals to pick up mail and packages, provided they are listed on the PS Form 1583. This is accomplished by using the physical address of the actual CMRA and designating a "Suite," "Apt," or "Box" number as annotated on the PS Form 1583. These designations can be used to mask the lack of a physical business address or the true location of a business.

13. An analysis was completed of the use of LLP investor funds received by SOG. As previously noted, LLP prospectuses reflected investor funds were to be used fifty percent for hard assets and fifty percent for oil and gas exploration. Approximately $2,000,000.00 of LLP investor funds were deposited into SOG Wells Fargo bank accounts along with comingled funds from other sources. Summaries of Wells Fargo bank accounts are provided, in part, as follows:

| Amount | Purpose | Bank Account |
|---|---|---|
| $1,215,784.55 | SOG employee payroll | Wells Fargo 1516; 9935 |
| $374,771.82 | LLP Investor interest payments | Wells Fargo 1516; 1825; 9919 |
| $352,000.00 | Day Trading/Swing Trading | Wells Fargo 9935; 9943 |
| $165,739.68 | Other investor payments | Wells Fargo 1516 |
| **2,108,296.05** | **Total** | |

Affidavit-Page 6 of 21

14. The Wells Fargo accounts listed above, opened by JVB with JVB as the authorized signer, were active during the time of A.S. investments into LLP with SOG. A.S.'s original investment check for $100,000 was deposited into account "9935" above.

15. Based on this analysis, the Affiant determined that funds deposited into the Wells Fargo accounts listed above had not been used for the purposes described in the prospectuses and appeared to have been misused by SOG. Over half of the investor funds went to employee payroll and day trading.

16. "Dividend" payments included payments to older investors from programs that preceded LLP. These "dividend" payments came from Wells Fargo accounts where deposits from newer investors were kept. This is highly indicative of a Ponzi related scheme where older investors are payed with newer investor money.

17. Following SOG, beginning about 2008, JVB and other conspirators began operating other oil and gas investment programs including Texas Energy Management and Texas Energy Mutual (TEM). It is noted that these business names have been used interchangeably. A business filing for Texas Energy Management, 2100 W. Northwest Highway, Suite 114, Grapevine, TX 76051, was made by Jay Mac Snyder in Tarrant County, TX on August 8, 2008. This address is the same CMRA box that was previously used by SOG. A business filing for Texas Energy Management, 1701 W. Northwest Highway, #100, Grapevine, TX 76051, was made by R.P. in Denton County, TX on June 3, 2013 and again on June 19, 2013. A business filing for Texas Energy Mutual, 1701 W. Northwest Highway, #100, Grapevine, TX 76051, was made by R.P. in Tarrant County, TX on May 13, 2015. An internet query of "Texas Energy Mutual" showed a website listing of www.texasenergymutual.com. On this website is listed that TEM is "A

Delaware LLC." Certified records the Affiant obtained from Delaware showed Texas Energy Mutual LLC was registered by United States Incorporation Agents in New Castle, DE.

18. The Affiants investigation showed that the address of TEM located at 2100 W. Northwest Highway, Suite 114, Grapevine, TX 76051 was a "Pack and Mail" mail drop. The PS Form 1583, *Application of Delivery of Mail Through Agent* listed the box holder as "Jim Van Blaricum" and that the box had been opened on November 2, 2010. The applicant home address was listed as 1909 Central Drive in Bedford, TX.

19. Investigation also showed that the address of TEM located at 1701 W. Northwest Highway, Grapevine, TX 76051 was a virtual office called "Meridian Business Center." The PS Form 1583, *Application of Delivery of Mail Through Agent* listed the box holder as "Jay Mac Snyder" and that the box had been opened on October 17, 2012. The applicant home address was listed as 8320 Marys Creek Dr, Benbrook, TX, 76116. The Affiant contacted the resident of this home during October of 2012. This resident stated she nor her husband knew Snyder, but did recall some mail being delivered in his name, which they returned to sender.

20. On July 16, 2013, the Affiant interviewed A.E., a former employee of JVB and TEM. A.E. did clerical work beginning March of 2013. While A.E. was completing spreadsheet analyses of TEM bank accounts, she noticed suspicious use of investor funds. These funds were not used towards oil and gas projects, but for payroll and JVB's personal expenses, trips to Ukraine, and ATM withdrawals in Ukraine. In June 2013, A.E. stopped working for TEM due to JVB's potentially fraudulent business practices. A.E. said JVB travels to Ukraine every six weeks and that he carries a money belt containing U.S. currency.

21. On July 18, 2013, the Affiant telephoned TEM using a number found on their website. The Affiant purported to be a potential investor and made contact with R.P. R.P. stated he was the

owner of TEM and was quickly suspicious of the conversation. R.P. stated his company operated out of "a virtual office, not a boiler room or anything." R.P. agreed to send an informational pamphlet about his company. A TEM pamphlet was sent to a P.O. Box controlled by Postal Inspectors. The Affiant visited the Post Office where this box is located around the time the TEM pamphlet had been delivered and witnessed R.P. in the Post Office lobby. A manager stated R.P. had a printed page with a delivery signature, and was questioning who owned the P.O. Box to which the pamphlet had been delivered. R.P. subsequently left three voicemails on the Affiant's cellular telephone. In these voicemails, R.P. was upset with the caller for giving a false number and for not answering his calls. R.P. also said he did "not appreciate the unprofessionalism, if you're working undercover."

22. In December of 2015, the Affiant contacted Agent Greg Christiansen with Immigration and Customs Enforcement. Agent Christiansen provided information he obtained from BBVA Compass Bank related to an account of a Ukrainian citizen named Y.B. This information concerned suspicious wire transfers coming into his BBVA account from "Acron Group" in Belize. The notes on these wires listed "Payment for education expenses."

23. Agent Christiansen queried immigration/visa documents on Y.B. and found a K-1 Student visa application which was issued on May 30, 2013. On this application it listed Y.B.'s sponsor as JVB. The memo portion read, "business student at University of North Texas, studying business, friend, JAMES VANBLARICUM of Texas Energy Management paying tuition and providing stipend, applicant knows sponsor through business associates in Ukraine, credible student."

24. Bank records subpoenaed from BBVA Compass for TEM listed R.P. and JVB as authorized signers on the account which was opened on December 12, 2013. These BBVA records showed

similar deposit activity as SOG related to oil and gas investments. This activity included numerous personal and cashier's checks being deposited into TEM accounts with memos reading "Mineral Lease," "Thunderhead Project," "Thunderhead Prospect," "Oil Wells (5)," "Lease Bank," "Thunderhead Five Well Prog," and "Oil/Gas." Approximately $9,000,000.00 had been deposited into the TEM accounts by investors from December of 2013 until June of 2015. About fifty (50) $10,000.00 international bank wires totaling $500,000.00 were identified to have been sent to "Acron Group Ltd" from February 10, 2014 to April 28, 2015. It is noted that the name "Arcon Group" was also used in wires (noted in Paragraph 23.)

25. Bank records subpoenaed from BBVA Compass for Y.B. showed from April of 2014 to July of 2015, 28 international wires totaling $283,445.00 had been deposited into his account from "Acron Group" in Belize (noted in Paragraph 23), "Sakret" in the Virgin Islands, and "Cartek" in London, England. Most of these wires came from Acron Group and all notes on the wires stated "Payment for education expenses." This account was funded almost exclusively by international wires from "Acron Group." Based on the Affiants experience in fraud, it was noted that the incoming wires were less than $10,000.00. Sending less than $10,000.00 is a practice that is commonly used to avoid U.S. currency reporting requirements of $10,000.00 or more. Further analysis revealed that personal checks totaling $136,200.00 were written to JVB from Y.B.'s BBVA account in the same timeframes as the incoming international wires.

26. Agent Christiansen queried travel records for JVB and Y.B. The Affiant also noted international spending activity for both TEM and Y.B. accounts. BBVA international debits and travel history provided by Agent Christiansen for both Y.B. and JVB were cross referenced to determine their location on a specific date. It was noted that from May of 2014 until May of 2015, JVB and Y.B. were never in the same cities on any date based on debits from the

respective BBVA accounts.  An analysis determined that from June 28, 2013 to May 9, 2015, JVB had traveled to the following foreign countries: The Netherlands, Germany, Belgium, Canada, Peru, Spain, France, Mexico, Nicaragua, UAE, and numerous times to Ukraine.  Debit spending by JVB was consistent with travel records and included rental cars, restaurants, hotels, airline tickets, numerous cash withdrawals, duty free purchases, bars, and nightclubs. Debits for "bridge-of-love," "Qpid network," "Dream Marriage," and "Anastasia" were identified.  These debits correspond to global and Russian internet dating websites.

27. Travel records showed that from December 15, 2013 to July 2, 2015, Y.B. had traveled to Netherlands, Ukraine, Singapore, and Thailand.  Debit spending by Y.B. from his BBVA account were consistent with travel records and included movie theater, supermarkets, restaurants, fuel stations, hotels, bars, and numerous cash withdrawals.

28. On December 4, 2015, the Affiant secured the trash left out on the public street for disposal at JVB's residence located at 6620 Sapphire Circle S., Colleyville, TX.  In this trash were cut up credit cards in the name of Signal Oil and Gas, various internet automobile information printouts, a mailing bag addressed to JVB at 1701 W Northwest Highway, Suite 114, Grapevine, TX, a UPS envelope addressed to TEM at 1701 W Northwest Highway, Suite 114, Grapevine, TX.  Also found was a document titled "Business Relationship Agreement." This document stated JVB and Y.B. would use the Texas dealer license of L.W. to sell vehicles. The capital to invest in vehicles would come from JVB and Y.B.   Also recovered was a "Durant Media LP" for "Leads for oil and gas" invoice billed to TEM with handwritten dollar amounts and the writing "I will tell you how much." Also listed on this document were wiring

instructions and SWIFT codes for a Latvian and Deutsche Bank in the US. The Affiant knows that SWIFT codes are used particularly for international wires.

29. On December 27, 2015, Y.B. arrived internationally at JFK airport in New York. During a border search of Y.B. on his arrival, several "Durant Media LP" invoices were found on his computer. These invoices appeared to be very similar to those recovered in the trash of JVB with corresponding invoice numbers (noted in Paragraph 31).

30. TEM BBVA bank records showed numerous checks written to "Central Plaza" with a memo of "Suite 103," "Rent," or "Rent 103." The most recent check, number 4519, was for $1000.00, dated May 1, 2015.

31. On January 14, 2016, a query of Tarrant Appraisal District records indicated the owner of 1909 Central Drive, Bedford, TX to be Central Plaza JV. The Affiant visited 1909 Central Drive, Bedford, TX. The building is a multi-level, brick office building. Upon entering the office building, suite 103 is to the immediate left. Inside the glass door of Suite 103 was a tall desk/partition with TEM pamphlets, and "Thunderhead" Pamphlets displayed on it. A desk was on the right with one computer screen with a screen saver visible. There was another room straight ahead to the right.    There did not appear to be anyone present in the office. Photographs of what was visible through the glass door into the office were taken. The office door was securely locked.

32. On January 14, 2016, the Affiant visited the Bedford Post Office and spoke telephonically with Letter Carrier D.C., who routinely delivers mail to 1909 Central Dr, Suite 103, Bedford, TX. D.C. said TEM is the business that has received mail there, but they haven't had mail delivery

in over one year. D.C. said he has seen men inside the office at times. D.C. said he has never seen a woman inside the office.

33. Google Adwords was subpoenaed based on debits from the TEM BBVA Accounts to Google. Google Adwords is a service provided by Google by which users pay a fee for internet search campaigns. The records showed "Jim Van" listed as the business name and "Texas Energy Management" as the Company which had been advertising since April 20, 2011. The Google subscriber was listed as "C.I." with phone number 214-208-8882 (a known cellular phone number registered to JVB.) Google information showed that TEM was "paying per click" for an internet campaign using keywords such as "Safe Oil Investments," "Energy Investments," "Tax Advantage," and "Patriotic Investments."

34. C.I. is listed on a TEM oil and gas pamphlet as "Member, Marketing and Communications".

35. Internet Protocol (IP) address information was requested from Time Warner Cable, Clear, and AT&T based on captured IP information from Google Adwords login/logout data. IP subscriber information received from Time Warner Cable showed that "Acura Information Media" with a subscriber address of 1909 Central Drive Ste 103, Bedford, TX 76021 and a billing address of 1903 Central Drive Ste 310, Bedford, TX 76021. IP information from AT&T showed the subscriber to be "Action Information Media" under the name of JVB with a service address of 1903 Central Drive Ste 310, Bedford, TX 76021. These IP addresses were used to log into a Google Adwords account for TEM on July of 2015 and October of 2015.

36. On January 22, 2016, the Affiant met with J.B., an attorney with the Securities and Exchange Commission in Fort Worth, TX. J.B. stated he had spoken with an investor with TEM named D.K. and that this investor was concerned about his investment. J.B. provided the Affiant a letter from D.K. addressed to TEM dated April 15, 2015, which stated he had invested

$24,229.75 with TEM. D.K. wrote that it was his second attempt to contact TEM, expressing his concern about his investment being transferred to another program called "ORAP." D.K. stated he then spoke with R.P. at TEM, who told him his investment was transferred due to delays in getting a permit for a disposal well. D.K. stated he had only received three payments from TEM totaling $770.25.

37. In January of 2016, on two separate days, Agent Christiansen obtained trash left out on the curb at the residence of JVB at 6620 Sapphire Circle South, Colleyville, Texas. In one of these trash pulls an airline receipt was found in the name of A.M. Agent Christiansen queried immigration records and determined that JVB sponsored A.M. The non-immigrant visa information showed A.M.'s visa was issued on June 9, 2015. A.M. is a 24 year-old Ukrainian national who listed JVB as a "Friend" and A.M. listed "Texas Energy Management" as the entity/company/organization paying for her visit to the U.S. A.M. listed the University of North Texas as her school and that she had a scholarship to study English for one year. In an additional trash pull at the residence of JVB, a utility bill from Denton, TX for A.M. was located as well as an online booking from Delta airlines in the names of JVB and A.M. for February 21, 2016 from LaGuardia, NY to Dallas/Ft Worth, TX. Also found, were joint travel itineraries for R.P. and JVB as well as Chase bank online printouts. One line of the Chase printout listed a wire on July 15, 2015 to "Arcon Group" for $10,000.00.

38. On February 9, 2016, the Affiant received a complaint sent to the SEC on March 27, 2015 by victim J.G. which stated he invested $10,000.00 with TEM in April of 2013. J.G. stated he was promised a 70-80% rate of return on his investment. J.G. stated he only received a few small checks in the amount of $100.00. J.G. stated when he went to the bank to cash the TEM checks and the bank told him the account was closed and he was charged a fee. J.G contacted

TEM and was told by them the fees would be covered, but never sent him any more checks. J.G. stated he signed the first page of a subscription agreement and sent a check to TEM. J.G. wrote that his signature was then copied (forged) to the back of the contract stating he read and understood the contract.

39. Chase Bank business accounts for TEM (listed below) were identified and subpoenaed. Three signers on the accounts were listed as VanBlaricum, R.P., and R.M. R.M. is listed on a TEM oil and gas pamphlet as "Accounting Manager." The TEM Chase accounts showed similar suspicious activity to those for TEM at BBVA Compass. Numerous large deposits were being made with memos "Thunderhead IV," "1/4 Unit of Thunderhead III," and "3/4 Unit of Thunderhead III." These are known purported oil and gas investment projects of TEM. Following these deposits, the money was transferred to several different TEM Chase accounts. Following these transfers, small payments were made to numerous investors. Also noted in the Chase TEM bank records were investor deposits as well as international wires to "Durant Media LP" from Chase account 716375501 in November and December of 2015 which matches the information located in the trash of JVB and on the computer of Y.B. (Paragraphs 31, 32). Also located was a Chase business account 716958033 titled "Accurate Information Media" with JVB as the sole signer on the account. Numerous checks with memo "invoice" and "lead" from TEM were deposited into this account. In this account, numerous international wires to "Durant Media LP." and to Managua, Nicaragua for "Loan Repayment" were found.

| Account Number | Open Date | Balance Nov-Dec, 2015 | Signator on Account |
|---|---|---|---|
| 738398952 | 7/23/15 | $157,077.65 | VanBlaricum/R.P./R.M. |
| 738513253 | 7/23/15 | $138.88 | VanBlaricum/R.P./R.M. |
| 738516611 | 7/23/15 | $26,703.33 | VanBlaricum/R.P./R.M. |
| 738518310 | 7/23/15 | $6063.81 | VanBlaricum/R.P./R.M. |
| 738520308 | 7/23/15 | $23,100.00 | VanBlaricum/R.P./R.M. |
| 738521876 | 7/23/15 | $470.24 | VanBlaricum/R.P./R.M. |
| 765002113 | 9/9/15 | $60,328.00 | VanBlaricum/R.P./R.M. |
| 716375501 | 5/13/15 | $2038.69 | VanBlaricum/R.P. |
| 716958033 | 5/15/15 | $4767.64 | VanBlaricum |
| | | **$280,688.24** | |

40. On February 18, 2016, the Affiant visited 1903 Central Drive, Suite 310, Bedford, TX based on the Time Warner IP information found in Paragraph 38. The building was located in the same general area as the TEM office at 1909 Central Drive, Suite 103, Bedford, TX. Upon entering the building, a "Bedford Place" directory listed "310 T.E.M. Administrative Offices" directly in the front lobby. Upon exiting the elevator Suite 310 is down a hallway and listed the same "T.E.M. Administrative Offices" marking on the left side of the door. The door to 310 was mirrored and locked. Upon peering inside there was a copy machine directly ahead and what appeared to be an adjacent room to the left. Immediately to the right was a computer desk with a screen saver on the computer screen. A baseball hat hanging from a desk shelf appeared to bear the TEM logo. Binders were visible on a shelf to the lower right, one of which read "F.W." The Affiant subsequently reviewed bank records from TEM BBVA and noted about 30 payments from TEM to F.W. for "consulting fees" totaling about $106,000.00.

41. On February 18, 2016, the Affiant spoke with carrier D.C., who delivers mails to TEM Administrative Services at 1903 Central Drive, Suite 310, Bedford, TX. D.C. said he has delivered packages to this address, and recalled some coming from Amazon.com. D.C. said he has only seen white males working in the office. D.C. said a white male in his 40s or 50s

with a white beard has received packages in the past. D.C. said TEM does not receive much mail at this address. D.C. said he is unaware of any connection between TEM at 1909 Central Drive, Suite 103, Bedford, TX that had been previously discussed. D.C. said there was currently some mail in a cluster box for TEM at 1909 Central Drive, Suite 103, Bedford, TX.

42. On February 19, 2016, the Affiant visited employees G.J. and L.F. at RM Crowe Property Management, the property manager of 1903 Central Drive, Suite 310, Bedford, TX. L.F. provided a copy of the lease for this property. JVB leased the property under the business name "Charles T. Evans Company" on March 22, 2012. G.J. said the company is some kind of energy company. A review of TEM BBVA bank records located numerous checks written to RMC with memos "Suite 310," "Charles Evans 310,"and "Office 310." A query of Tarrant County, TX business records showed JVB registered Charles T. Evans on February 16, 2011.

43. A query of the Tarrant County, TX Assumed Names business database showed that JVB registered a sole proprietorship called "Charles T. Evans" on 2/16/2011. The address listed was 2100 W. Northwest Hwy #114, Grapevine, TX 76051.

44. On February 23, 2016, the Affiant visited 1905 Central Drive, Bedford, TX and met with T.B. and F.B., owner of Brooks Homes, and leased 1909 Bedford Drive, Suite 103, Bedford, TX to TEM. T.B. believes TEM is in the oil business and has seen only younger men in the office. T.B. said TEM does some form of telemarketing. F.B. said a Hispanic woman brings her a monthly rent check, but does not believe she works at the TEM office rented from them. F.B. reviewed the lease and stated JVB leased the office space beginning in December of 2008. There was no business name listed on this lease.

45. On February 25, 2016, the Affiant interviewed C.H., who had invested $240,000.00 with TEM in June of 2013. C.H. immediately told the Affiant that TEM stole his money. C.H. said R.P.

cold called him and kept "bugging" him enough that he eventually invested.  C.H. said he invested in the Thunderhead program and was told the program would be done in three years.  R.P. told C.H. his money would be returned after this time yet kept trying to get C.H. to transfer it to another program.  R.P. told C.H. he wasn't doing anything with his money so C.H. asked R.P. for his investment back.  C.H. said R.P. would not give his investment back and told him "everything is down right now." C.H said to date, he has received a few checks from TEM in small amounts of about $100.00.

46. On June 30, 2016, Postal Inspector Tim Vasquez visited 1903 Central Drive, Suite 310, Bedford, TX.  He noted that there was a male present inside the office and that a woman, who had just exited the elevator, went into the office.  Inspector Vasquez visited 1909 Central Drive, Suite 103, Bedford, TX.  He noted there was a man working inside this office.

47. On July 5, 2016, the Affiant called Chase Bank Investigator R.C. to obtain current balances on TEM accounts.  R.C. stated that in May of 2016, large suspicious money transfers occurred in the TEM accounts and that all the accounts were flagged by the Chase Bank Anti-Money Laundering team based on various parameters Chase identifies.  R.C. read the notes associated with the accounts and said transactions were indicative of a Ponzi scheme consisting of check deposits and wires from investors which were then layered and debited to different individuals.  All the TEM accounts were zero balance.   Six new accounts at Chase Bank were opened on April 19, 2016 for Spector Exploration LLC in the names of VanBlaricum/R.P./R.M.  A check for $120,000 from an individual in Georgia was deposited into a Spector Exploration account with "Investment" written in the memo line.  Small debits to other individuals were then noted.  All the Spector Exploration accounts were zero balance.  R.C. said a total of 17 Chase Bank business and individual accounts associated with VanBlaricum, R.P., and R.M. were closed.

R.C. reported the closing check from Chase Bank for TEM in the amount of $131,000 was deposited at Frost Bank.

48. On July 5, 2016, the Affiant contacted Frost Bank Investigator J.R., who stated 6 Frost accounts had been opened in the name of Spector Exploration. J.R. stated a check in the amount of $131,000 was deposited on June 22, 2016 into a Spector account and that the funds had been depleted. J.R. said one account contained $34,000.00. J.R. stated on July 6, 2016, the balance had decreased to $24,000.00. J.R. said there are two signers on the account, C.I. and R.M.

49. On July 5, 2016, the Affiant visited 1452 Hughes Road, Suite 200, Grapevine, TX 76051. This address is a virtual office that offers a service of receiving mail and packages as well as provides an answering service. M.F., who was working behind the front desk, stated Spector Exploration was a new customer and that they started service with them on April 1, 2016. M.F. said a man named "Jim Van" opened the account and that they were providing them answering service as well as mail and package service. M.F. said she did not have any identification on file for Jim Van because it is not required to open the account. M.F. stated "Lupe" and "Chet" also pick up mail and packages for Spector. M.F. said she believed Spector is an oil exploration company.

50. The Affiant queried Texas State business records and found "Spector Exploration LLC" had been registered by Rodney L. R.P. on April 5, 2016. On May 31, 2016 an amended Texas State filing requested C.I. be added as managing number, with a mailing address of 1452 Hughes Road, Suite 200, Grapevine, TX 76051.

51. On August 18, 2016, following his arrest, JVB stated to Affiant that received Social Security. Other than victim investor funds that is the only source of income Affiant has discovered.

52. On September 21, 2016, the Affiant spoke with Chris Greever, who was the Director of Field
Operations for TEM. Greever had previously been interviewed by the Affiant in Tulsa, OK
on September 19, 2016. Greever stated there were currently two bonds he filed for TEM in
OK, both for $25,000.00. One was filed with the State of Oklahoma and the other with the
Corporation Commission. The Affiant contacted the Oil and Gas Division of the Oklahoma
Corporation Commission and determined that TEM had submitted Cashier's Check
#501364818 for a surety bond in the amount of $25,000.00. The Affiant was contacted by
Tracy Case with the Assistant General Counsel for the Oklahoma Oil and Gas Division who
indicated this money may be used to plug the wells of TEM. The Affiant indicated intent to
seize these funds and Case provided the following contact for seizure:  Bob Campbell, Agency
Counsel, Jim Thorpe Bldg, 2010 N Lincoln Blvd, Oklahoma City, OK, 73152. (See
Attachment A.)

53. On September 23, 2016, the Affiant contacted the Oklahoma Secretary of State related to a
$25,000.00 surface damage bond on file for TEM. The Affiant spoke with Marcia Thompson,
who stated there was a $25,000.00 bond for TEM, filed by Chris Greever. Thompson verified
the cashier's check associated with this bond as #55017605. Thompson provided the following
address for seizure: Secretary of State of Oklahoma, 2300 N. Lincoln Blvd. Room 101,
Oklahoma City, OK 73105-4897. (See Attachment A.)

## CONCLUSION

54. Based on the above facts, the Affiant believes probable cause exists that the bonds listed in
Attachment A were purchased with the fruits of the commission of federal criminal offenses,
namely, 18 U.S.C. § 1341 and 1343 (Mail and Wire Fraud); 18 U.S.C. § 1349 (Attempt and
Conspiracy); and 18 U.S.C. § 1956 (Money Laundering). Therefore, I respectfully request that

a search and seizure warrant be issued, authorizing me, as a U.S. Postal Inspector, with appropriate assistance from other law enforcement officers, to seize the funds described in ATTACHMENT A.

I declare under penalty of perjury that the foregoing is true and correct.

Matthew J. Write
U.S. Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me on this the 24th day of October at 2:00 a.m./p.m., in Fort Worth, Texas.

JEFFREY L. CURETON
United States Magistrate Judge

## ATTACHMENT A

## ITEMS TO BE SEIZED

1.  Texas Energy Management surety bond paid to Oil and Gas Division of the Oklahoma Corporation Commission with check #501364818 in the amount of $25,000.00.

2.  Texas Energy Management surety bond paid to Oklahoma Secretary of State with check #55017605 in the amount of $25,000.00.